RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0099p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

DAYCAB COMPANY, INC.,

*Plaintiff-Appellant*,

*v.*

PRAIRIE TECHNOLOGY, LLC; BIG TRUCK PARTS, LLC;
WILLIAM R. OSMAN; WANDA OSMAN,

*Defendants-Appellees*.

No. 22-5625

———————————

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:20-cv-00063—Travis Randall McDonough, District Judge.

Argued: March 16, 2023

Decided and Filed: May 11, 2023

Before: MOORE, CLAY, and STRANCH, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Donald K. Vowell, THE VOWELL LAW FIRM, Knoxville, Tennessee, for Appellant. Stephen C. Landon, CADWELL SANFORD DEIBERT & GARRY LLP, Sioux Falls, South Dakota, for Appellees. **ON BRIEF:** Donald K. Vowell, THE VOWELL LAW FIRM, Knoxville, Tennessee, for Appellant. Stephen C. Landon, Melissa R. Jelen, CADWELL SANFORD DEIBERT & GARRY LLP, Sioux Falls, South Dakota, James R. McKoon, MCKOON, WILLIAMS, ATCHLEY & STULCE, PLLC, Chattanooga, Tennessee, for Appellees.

———————————

## OPINION

———————————

CLAY, Circuit Judge. Plaintiff DayCab Company, Inc. appeals the district court's entry of summary judgment for Defendants Prairie Technology, LLC, Big Truck Parts, LLC, and

William and Wanda Osman in Plaintiff's case alleging trade dress infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104. For the reasons set forth below, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's grant of summary judgment and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

### Factual Background

**A. Plaintiff DayCab Company, Inc.**

DayCab designs, manufactures, and sells conversion kits for tractor-trailer cabs that convert a sleeper tractor—which has a compartment designed for long-haul driving, with a sleeping unit for the driver—into a tractor that does not have a sleeper unit (a "daycab"). DayCab's founder, Marc Wagers, started his first conversion kit business in 1997 and has been continuously involved in the design and manufacture of conversion kits since that time. Wagers stated that he created the first Peterbilt extended-cab conversion kits on the market, which he termed "Fat Albert" models. In 2004, DayCab introduced "XL" conversion kits for two types of Peterbilt trucks, the Unibilt and the Ultracab models. DayCab spent significant time and money marketing its products and succeeded in growing sales of its products.

Wagers' goals in designing the XL models were to: (1) "allow more room in the cab for the driver and/or for storage of more equipment than the flat-panel unit provided;" (2) "allow for the installation or use of an air-ride system or similar equipment, in some cases;" and (3) "be distinctive in appearance so it would be recognizable by consumers." Marc Wagers Decl., R. 188, ¶ 11, Page ID #2298. The depth of the conversion kit, an additional 5.375 inches, "allows additional room inside the cab" and the slant-back design of the conversion panel "allows space for the attachment of air-ride equipment." DayCab's Resps. to Interrogs., R. 199-2, PageID #3007. Wagers attested:

> I could have designed the XL models in any number of additional ways, or with any number of different looks, and the design I ended up with was my choice as a matter of personal taste. I considered and decided against several other possible

designs, including designs with different angles, curves, tapers, lines, profile and appearance, but finally settled on what became the final model because I liked the way that it looked.

Wagers Decl., R. 188, ¶ 11, Page ID #2298.

Wagers stated that he "carefully selected" the "angles, curves, tapers, lines, profile and appearance" of the DayCab conversion kit "with the aim of making a very distinctive and attractive kit," but "any number of other angles, curves, tapers, lines, profile and appearance" would have also served as a Peterbilt conversion product. *Id.*, ¶ 24, Page ID #2306. Wagers acknowledged it was "necessary to leave 5–6 inches of flat surface or clearance along the bottom edge to allow for the attachment" of the shock absorbers for an air-ride system, but stated that it was not necessary to use the "slant-back" design of 144 degrees. *Id.*, ¶ 14–16, Page ID #2301–2302. Another angle could be used to accommodate the air-ride system. As for the particular 144 degree angle of the slant-back that he used, Wagers attested that it occurred by happenstance because the engineer who made the conversion kit mold used the exact angle that Wagers had included in his hand-drawn design. When designing the particular dimensions of the depth and radius of the design, Wagers stated that they arose when he asked his engineer to make the design look "less pointy," which resulted in the radius of 1.5 inches and the depth of 5.375 inches. *Id.*, ¶ 20 & 21, Page ID #2303–2304.

Further demonstrating that the Peterbilt conversion product can be designed in a number of ways, Wagers attested that competitor companies manufacture functional Peterbilt conversion kits that are "completely different from the DayCab design and appearance." *Id.*, ¶ 17–18, Page ID #2302–2303. Wagers also presented two alternative designs created by DayCab personnel to show that it was possible to create functional conversion kits different from the DayCab model.

In a second declaration, Wagers attested that the only requirement for manufacturability is that the top of the fiberglass mold used for manufacturing the conversion kits must be slightly larger at the top than at the bottom. Wagers also attested that the exterior coating of soft-sanding gelcoat comes in numerous colors other than gray, none of which is more or less difficult to sand or paint than another.

**B.  Defendants Prairie Technology, LLC, Big Truck Parts, LLC, and the Osmans**

William Osman is an owner of both Big Truck Parts and Prairie Technology.  He is married to Wanda Osman.  William Osman began making conversion kits in 1998.  Shortly after, Osman obtained a utility patent for a panel used to convert a sleeper truck cab into a day cab.

In 2015, Osman started Prairie Technology, LLC and Big Truck Parts, LLC.  Since then, William and Wanda Osman have conducted business through those entities and not in their personal capacities.  Prairie Technology designs and manufactures conversion kits, and Big Truck Parts sells them.  The price of the kits ranges from $1,325 to $2,060.  Each kit is manufactured and sold with an identification card with Prairie Technology's logo embedded in the fiberglass and is shipped in a box bearing Prairie Technology's logo.  Additionally, Big Truck Parts includes a placard bearing its name and logo to be placed on the driver's side door of reconfigured cabs.  Big Truck Parts and Prairie Technology named their conversion-kit products: "Cousin Albert," "Uncle Albert," and "Fat Boy."  Wagers Decl., R. 188, ¶ 34 & 36, Page ID #2312 & 2314; Prairie Technology Invoices, R. 189, Page ID #2382–2390.

**C.  Dr. George Wandling's Expert Opinion**

Dr. George Wandling prepared a preliminary report in anticipation of testifying as an expert defense witness.  Dr. Wandling is a licensed professional engineer who received his doctorate in mechanical engineering from Iowa State University in 2000 and has more than forty years of mechanical engineering experience.  In his report, Dr. Wandling stated that he based his opinions on records, data, and materials provided to him, an inspection of Prairie Technology conversion kits for Unibilt and Ultracab Peterbilt trucks, DayCab kits for Ultracab trucks, and an interview with Osman.

Dr. Wandling conducted a laser analysis to determine the measurements of Prairie Technology's Ultracab and Unibilt conversion panels and of DayCab's Ultracab conversion panel.  DayCab did not provide a Unibilt conversion panel to Dr. Wandling for analysis.  Dr. Wandling's report stated:

> The Prairie Technology and Daycab Ultracab conversion panels are not identical. The Prairie Technology Ultracab panel can be physically placed inside the

Daycab panel. The depth of the panel is a function of the Peterbilt seat location and the seat's extension beyond the rear of the cab structure. If the Peterbilt seat did not extend beyond the conversion panel mounting surface, the panel would be flat. The use of a radius rather than a sharp corner at panel edges is functionally required for manufacturability of the panel, and the radii used by Prairie Technology and Daycab are distinctly different. The sloped bottom surface of the panel functionally provides clearance for the Peterbilt suspension hardware, facilitates removal of the panel from the mold, and has an[] acute angle of approximately 36 degrees. The gray color of the panel is a function of the gel coat used in the manufacture of the panel and each panel is ultimately painted to the specification of the purchaser.

Wandling Report, R. 199-2, Page ID #2951.

At the conclusion of his report, Dr. Wandling provided the following opinions: (1) that Osman's patent for a panel was issued before DayCab sold its first Peterbilt kit; (2) that "DayCab has not produced any evidence" that its kits were "designed and manufactured" prior to Prairie Technology's; (3) that the DayCab and Prairie Technology kits "are not identical;" (4) that Defendants "did not take a wax or plaster or similar impression of DayCab's Ultracab conversion panel nor intentionally make an exact or near-exact replica of . . . DayCab's Ultracab panel using other means;" (5) each company's "panel's depth, top body radius, lower body angle, flange/body radius" and color are functional; and (6) DayCab may have infringed on Osman's patent. *Id*., Page ID #2955.

**Procedural Background**

DayCab sued Prairie Technology, LLC and Big Truck Parts, LLC in Tennessee state court and Defendants removed the case to federal court based on diversity jurisdiction. In the operative second amended complaint, DayCab named William and Wanda Osman as defendants in addition to Prairie Technology and Big Truck Parts. DayCab asserted claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104, for trade dress infringement, seeking monetary and injunctive relief. Prairie Technology and Big Truck Parts counterclaimed for a declaratory judgment that DayCab's trade dress is functional and that Defendants have not infringed on DayCab's trade dress or trademark.

After discovery closed, DayCab filed a motion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the testimony of Defendants' expert, arguing that Dr. Wandling's opinions were not based on any scientific, technical, or other specialized knowledge, and that the opinions would not be helpful to the trier of fact. The district court granted the motion in part, excluding the first, second, and sixth opinions of Dr. Wandling because they would not be helpful to the jury. The court excluded the fourth opinion because Dr. Wandling was not qualified to opine on Osman's intention. However, the district court did not exclude Dr. Wandling's third opinion regarding the similarity of the two conversion kits or his fifth opinion regarding the functionality of the two conversion kits. It reasoned that Dr. Wandling was qualified to testify on those matters based on his years of engineering experience, examination of the products, and his statement in his report of why the trade dress was functional. On appeal, DayCab challenges the district court's failure to exclude Dr. Wandling's opinion regarding functionality, arguing that Dr. Wandling lacked the qualifications necessary to render an expert opinion on the subject.

In addition, the parties filed cross discovery motions regarding the testimony of Marc Wagers. DayCab moved to supplement its expert disclosure by adding Wagers as an expert witness, but the district court denied the motion because the deadline for disclosing experts had passed. For their part, Defendants moved to strike certain portions of Wagers' testimony on the grounds that it constituted undisclosed and improper expert testimony. The district court granted in part Defendants' motion, striking four portions of Wagers' testimony that it determined were impermissible legal conclusions, speculative, or irrelevant. On appeal, DayCab does not challenge the district court's ruling excluding portions of Wagers' testimony, nor does it rely on the stricken portions of Wagers' testimony as evidence.

The parties filed cross motions for summary judgment. Defendants moved on the basis that DayCab would not be able to prove any of the three essential elements of its trade dress claim, namely: nonfunctionality, secondary meaning, and likelihood of confusion. *See Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l., Inc*., 730 F.3d 494, 503 (6th Cir. 2013). Defendants also argued that DayCab's claims were time-barred. DayCab moved for partial summary judgment on its trade dress infringement claim.

Ultimately, the district court denied summary judgment to DayCab and granted summary judgment to Defendants on their corresponding counterclaim for declaratory judgment. The district court held that the undisputed evidence showed that DayCab's asserted trade dress for its conversion kits was functional and therefore not protectable. The court did not reach the issues of secondary meaning, likelihood of confusion, or the time bars to DayCab's claims. DayCab timely appealed.

## DISCUSSION

### Standard of Review

"We review de novo a district court's grant of summary judgment in a trade dress claim case." *Leapers, Inc. v. SMTS, LLC*, 879 F.3d 731, 735 (6th Cir. 2018) (citing *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 546 (6th Cir. 2005)). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute of a material fact is genuine so long as 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 660 (6th Cir. 2020) (quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016)). This Court must draw all reasonable inferences in favor of the non-moving party. *Leapers*, 879 F.3d at 735.

### Analysis

### I. Trade Dress under the Lanham Act[1]

Section 43(a) of the Lanham Act protects from infringement the unregistered "trade dress" of a product. 15 U.S.C. § 1125(a)(3); *Wal–Mart Stores, Inc. v. Samara Bros*., 529 U.S. 205, 210 (2000); *Groeneveld*, 730 F.3d at 503. This Court has held that:

"'Trade dress' refers to 'the image and overall appearance of a product.' It embodies 'that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, [that] make[s] the

---

[1]Because we find that DayCab's state law claim for unfair or deceptive acts or practices under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104(b)(1), (2), and (3) is barred by the applicable statute of limitations, we need not review the merits of the claim. *See infra*, Section II (2).

source of the product distinguishable from another and . . . promote[s] its sales.'" Trade dress "'involves the total image of a product and may include features such as size, shape, color, or color combinations, texture, graphics, or even particular sales techniques.'"

*Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (first quoting *Ferrari v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991), then quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992)) (alterations in *Abercrombie*).

In this case, DayCab seeks to protect the overall design of its conversion kit panel, including the panel's angles, lines, tapers, curves, and profile. Specifically, DayCab asserts the following as its protectable trade dress: (1) the slant-back design with specific angles and radii, including a 144 degree slant towards the cab and rolled edges with radii of 1.5 inches; (2) the depth of 5.375 inches; (3) the rounded edges with specific angles and radii; and (4) the gray color.

To prevail on its claim for the infringement of its product design trade dress under the Lanham Act, DayCab must show that its allegedly infringed product design is: "(1) nonfunctional, (2) has acquired secondary meaning, and (3) is confusingly similar to the allegedly infringing product design." *Groeneveld*, 730 F.3d at 503. The first two elements concern protectability—that is, that DayCab's asserted trade dress is capable of Lanham Act protection—and the third element requires a showing that Defendants have infringed on the trade dress. *Abercrombie,* 280 F.3d at 629.

### 1. Nonfunctionality

The district court granted summary judgment to Defendants because it determined that no reasonable juror could find that DayCab's product design was nonfunctional. We conclude that the district court erred in its determination. DayCab has presented a genuine dispute of material fact regarding the nonfunctionality element of its trade dress claim.

The nonfunctionality requirement "channel[s] the legal protection of useful designs from the realm of trademark to that of patent" to ensure "that the high public costs of monopoly are not imposed without an assurance that the design satisfies the rigorous requirements of patentability[.]" *Groeneveld*, 730 F.3d at 508. A product design is functional "if it is essential to

the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 850 n.10 (1982). "Evidence that a product design is purely 'ornamental, incidental, or arbitrary' can be evidence of an absence of functionality." *Leapers*, 879 F.3d at 736 (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc*., 532 U.S. 23, 30 (2001)). However, a design may have incidental functionality if it turns out to have functional value despite an original aesthetic intent. *See Inwood*, 456 U.S. at 850 n.10. Further, evidence of aesthetic intent alone may be insufficient to show that a feature is nonfunctional, as "some products function based on their aesthetic properties through so-called 'aesthetic functionality,'" meaning a design that "communicates the use, purpose, cost, or quality of the product in a way that competitors cannot avoid replicating without incurring costs." *Leapers*, 879 F.3d at 737 (quoting *Abercrombie*, 280 F.3d at 642). "But 'there are few aesthetic designs that are so fundamental to an industry that competitors cannot fairly compete without free use of [them].'" *Leapers*, 879 F.3d at 737 (quoting 1 *McCarthy on Trademarks and Unfair Competition* § 7:81 (5th ed.)). Accordingly, "a party's initial burden to show that a design lacks aesthetic functionality is not substantial; the plaintiff need only show that the design is not a competitive necessity such that 'exclusive use . . . would put competitors at a significant non-reputation related disadvantage.'" *Id.* (quoting *TrafFix*, 532 U.S. at 32–33).

Defendants contend that DayCab's product design is not protectable because it is functional. Based on the testimony of the operator of a competitor company and an installer of the conversion kits, Defendants argue that the function of the conversion kit panel is to cover the opening created by removing the sleeper berth and to create more room in the truck cab. Defendants also point to DayCab's statements on its website about the functionality of its product design and to DayCab's interrogatory responses stating that the slant-back feature "allows for the attachment of air-ride equipment" and that the depth "allows additional room inside the cab." DayCab's Resps. to Interrogs., R. 199-2, Page ID #3007.

However, while a product may serve a function, that does not render its specific features necessarily functional. For instance, in *Leapers*, the Court considered a unique "knurling" pattern which the plaintiff used to add texture to adjustable rifle scopes. *Leapers*, 879 F.3d at 733. The Court held that while knurling was a functional component of the rifle scope, a jury

could reasonably conclude that the knurling design that the plaintiff used on its rifle scopes was "purely ornamental and therefore nonfunctional." *Id.* at 738. It noted that the variety of patterns that could be applied to an adjustment knob was "effectively unlimited" and there was no "scarcity" or "depletion" of available designs. *Id.* at 739. Similarly, in this case, while the conversion kit panel serves the general function of covering the opening in a truck cab, there remains a genuine dispute of material fact whether the specific design of the panel constitutes protectable trade dress, as that design is not the only design available.

In his declaration, Wagers stated that he created the DayCab conversion kit panel design as a "matter of personal taste," that he settled on the final design by "happenstance," because he "liked the way that it looked," and that the exact angles, depth, and radii arose from Wagers' finetuning of the panel's appearance. Wagers Decl., R. 188, ¶ 11, Page ID #2298. These statements by Wagers show his aesthetic intent in designing and configuring the panel. That evidence tends to show that the product's design is "ornamental, incidental, or arbitrary," which in turn tends to show the absence of functionality. *Leapers*, 879 F.3d at 736. When aesthetic intent is established, the relevant inquiry is whether the design is functional so that "competitors cannot avoid replicating without incurring costs 'not to copy but to design around.'" *Id.* at 737 (quoting *Abercrombie*, 280 F.3d at 642-43). Relevant to this inquiry, DayCab presented evidence of designs for functional conversion kit panels that do not replicate DayCab's design, including designs used by two competitor companies and new designs created by DayCab personnel.

Defendants argue that we need not, and should not, consider this evidence of alternative functional designs based on the legal principle that once "a trade dress is found to be functional, the mere fact that there are other non-infringing designs which would serve the same functional purpose is no defense to functionality." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 416 (6th Cir. 2006); *see also TrafFix*, 532 U.S. at 33 (where a product design is functional under the *Inwood Laboratories* test, "[t]here is no need . . . to engage . . . in speculation about other design possibilities . . . which might serve the same purpose"). In contrast to these two cases where the design was functional, regardless of other methods in providing that same function, in this case DayCab argues that the design serves no functional purpose at all. The existence of

alternative designs is relevant to the functionality determination because they support DayCab's contention that Wagers designed the panel with aesthetic intent and that its resulting features are ornamental rather than functional.

Additionally, Defendants argue that they are entitled to summary judgment because of Dr. Wandling's expert opinion that DayCab's product design is functional. Dr. Wandling opined that the "panel's depth, top body radius, lower body angle, flange/body radius" and color were functional features. Wandling Report, R. 199-2, Page ID #2955. He based this opinion on his conclusions that the depth of the panel was necessary to allow the seat to extend backwards; that the slant-back angle of 144 degrees created space for the air-ride system and facilitated removal of the panel from the mold during manufacturing; the rounded edges were "required for manufacturability of the panel;" and that the gray color was a function of the gelcoat used in the manufacture of the panel. *Id.*, Page ID #2951.

However, DayCab presented evidence that contradicts Dr. Wandling's opinion in the form of a declaration by Wagers. In his declaration, Wagers stated that the only requirement for manufacturability was that the top of the fiberglass mold used for manufacturing the conversion kits be slightly larger at the top than at the bottom of the mold, and that it was therefore not necessary for the panel to have a slant-back with the exact angle of 144 degrees. Similarly, Wagers stated it is not essential to use the exact angle of 144 degrees to allow space for the installation of the air-ride system. Further, regarding the color of the exterior gelcoat, Wagers stated that gray was not the only gelcoat color available, and that no color is more conducive to sanding or painting than another color. Because we draw all reasonable inferences in favor of the non-moving party, and Wagers' declaration contradicts Dr. Wandling's opinion, Defendants are not entitled to summary judgment and lack sufficient evidence to meet their burden. *See Leapers,* 879 F.3d at 735.

The parties have presented conflicting evidence regarding the functionality of DayCab's conversion kit panel. Accordingly, we conclude that genuine issues of material fact remain regarding the nonfunctionality element of DayCab's trade dress claim. The district court erred in granting summary judgment to Defendants on this basis.

### 2. Secondary Meaning

Next, Defendants contend that we may affirm the district court's grant of summary judgment on the alternative basis that no reasonable juror could conclude that DayCab's panel design has acquired secondary meaning. However, based on the evidence DayCab presented at summary judgment, we conclude that DayCab has raised a genuine dispute of material fact on the element of secondary meaning.

Secondary meaning "serves to identify the product with its manufacturer or source." *TrafFix*, 532 U.S. at 28. "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Lab'ys*, 456 U.S. at 851 n.11. "This Court applies a seven-factor test to determine whether secondary meaning exists in a trade dress: (1) direct consumer testimony, (2) consumer surveys, (3) exclusivity, length, and manner of use, (4) amount and manner of advertising, (5) amount of sales and number of customers, (6) established place in the market, and (7) proof of intentional copying." *Lanard Toys*, 468 F.3d at 418.

To start with the last factor, proof of intentional copying, DayCab posits that a juror could reasonably find that Prairie Technology intentionally copied DayCab's conversion panel design. In support, DayCab points to the testimony of Arvil Lewis, the owner of competitor FiberTech, who stated in regard to the Prairie Technology conversion kits that: "if you see them going down the road, I personally cannot tell one from the other when they're mounted on the truck because the design is very, very similar to DayCab." Lewis Dep., R. 189, Page ID #2407. DayCab also points to Wagers' testimony that: "[w]hen I see them on the road, I cannot tell whether it is our product or the Prairie Technology/Big Truck Parts product unless I get very close to them." Wagers Decl., R. 188, ¶ 39, Page ID #2315. Finally, DayCab points to Dr. Wandling's testimony that the Prairie Technology panel "can physically be placed inside the DayCab panel," as evidence showing that the panels are similar.

In response, Defendants contend that no intentional copying occurred. Defendants point to William Osman's statement that his panel design was informed by the structural frame of the

Peterbilt truck cab, by customer feedback seeking more space in the truck cab, and by the requirements for manufacturing.  Defendants also point to Dr. Wandling's expert testimony that the DayCab and Prairie Technology conversion panels are "not identical and are distinctly different in overall width, height, body radius, corner radius, window size, and mounting methodology."  Wandling Report, R. 199-2, Page ID #2951.  Defendants further argue that Dr. Wandling's statement that the Prairie Tech panel "can physically be placed inside the DayCab panel" referred to his opinion that the Prairie Technology panel was smaller than, not identical to, the DayCab panel.  *Id.*

Defendants present evidence that contradicts DayCab's theory of intentional copying, and offer a different interpretation of Dr. Wandling's opinion that supports their position.  However, given the evidence DayCab has presented, the record before us reveals a dispute of fact on the intentional copying factor.  This supports a determination that there is a genuine issue of material fact about secondary meaning, as "evidence of intentional copying shows the strong secondary meaning of [a product] because '[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'"  *Abercrombie*, 280 F.3d at 639 (citing *Ferrari*, 944 F.2d at 1239).

In addition, relevant to the fifth factor, the amount of sales and number of customers, DayCab argues that it spent significant money on advertising which resulted in an increase in sales.  DayCab points to Wagers' testimony that: "[m]any callers to DayCab have told me that they were calling because of both the print advertising and/or because of our appearances at the trade shows, that they recognize the distinctive slant-back design, and that when they see that design, they think of the DayCab Company."  Wagers Decl., R. 188, ¶ 54, Page ID #2322–2323. This is additional evidence supporting a determination that a genuine dispute of fact exists regarding the secondary meaning of DayCab's conversion kit panel.

Regarding the remaining factors that we consider in determining whether secondary meaning exists, the parties have not set forth arguments or identified evidence that relate to them. However, "[n]o single factor is determinative and every one need not be proven."  *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc*., 270 F.3d 298, 312 (6th Cir. 2001) (citing *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc*., 830 F.2d 1217, 1222 (2d Cir. 1987)).

DayCab has set forth a genuine dispute of fact on two of the factors, including evidence showing intentional copying, which tends to show strong secondary meaning. *See Abercrombie*, 280 F.3d at 639. Accordingly, we conclude that Defendants are not entitled to summary judgment based on the secondary meaning element.

### 3. Likelihood of Confusion

Finally, Defendants contend that we may affirm the district court's grant of summary judgment on the alternative basis that no reasonable jury could conclude that there is a likelihood of confusion between the products. However, based on the evidence DayCab presented at summary judgment, we conclude that DayCab has raised a genuine dispute of material fact on the element of likelihood of confusion.

The test for likelihood of confusion is whether an ordinary consumer would confuse the products at issue, incorrectly assuming that the products derive from one source rather than from different sources. *See, e.g.*, *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). The "'general concept underlying the likelihood of confusion is that the public believe that the [mark or dress] owner sponsored or otherwise approved the use of the trademark' or trade dress." *Abercrombie*, 280 F.3d at 645 (quoting *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 834 (6th Cir. 1983)). Whereas nonfunctionality and secondary meaning are required to show protectability—that is, that the plaintiff's trade dress is capable of Lanham Act protection in the first place—likelihood of confusion is required to show that the trade dress has in fact been infringed by the defendant. *Abercrombie*, 280 F.3d at 629.

We have enumerated:

> eight factors to consider in determining whether the trade dresses of competing products present a sufficient likelihood of confusion: "(1) strength of the plaintiff's [trade dress]; (2) relatedness of the goods; (3) similarity of the [trade dresses]; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the [trade dress]; (8) likelihood of expansion of the product lines."

*Groeneveld*, 730 F.3d at 509 (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985)).

Relevant to the third factor, similarity of the trade dresses, DayCab argues that the similarity of the panels alone demonstrates the likelihood of confusion.  DayCab also points to Lewis' and Wagers' testimony that they could not tell the panels apart.  DayCab argues that if Lewis and Wagers, who operate businesses in this industry, cannot tell the panels apart, then a jury could reasonably conclude that a consumer likewise would not be able to tell one from the other.

Relevant to the fourth factor, actual confusion, DayCab presented evidence of actual confusion between the products.  For instance, Wagers attested that that he has fielded "numerous inquiries" from customers interested in purchasing a "Fat Boy" even though DayCab sells only a product by the name "Fat Albert," and that the inquiries began in 2010 or 2011 after William Osman began marketing his conversion kit as the "Fat Boy."  Wagers Decl., R. 188, ¶ 63, Page ID #2327.  As recent examples, DayCab points to two customer inquiries about purchasing a "fat boy" conversion kit, one from 2020 and one from 2022.  DayCab argues that Defendants' use of a similar product design and similar product name shows that Defendants intended to create, and have created, market confusion.  Evidence of actual confusion is "undoubtedly the best evidence of likelihood of confusion." *Daddy's Junky Music*, 109 F.3d at 284 (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988)).

Defendants argue that the sixth factor, likely degree of purchaser care, weighs in their favor.  Ordinarily, the benchmark for assessing the likelihood of confusion is the ordinary consumer, but, as described in our Circuit:

> "[W]hen a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard [of consumer confusion] is proper.  Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases.  When services are sold to such buyers, other things being equal, there is less likelihood of confusion."

*Daddy's Junky Music*, 109 F.3d at 285 (quoting *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1111 (6th Cir. 1991)).  Defendants argue that the conversion kits are purchased only by industry professionals with significant care and research because the kits

are purchased directly from their suppliers, as opposed to sold in stores, and cost between $1,325 and $2,060.  Further, Defendants argue that the Prairie Technology conversion kits' packaging, components, and related advertising are clearly marked with Prairie Technology's and Big Truck Parts' names and logos.  Given the sophistication of the purchasers of conversion kits, this factor weighs in Defendants' favor.

Regarding the remaining factors, the parties have not set forth arguments or identified evidence that relate to them.  However, these factors are guides rather than rigid requirements to determine whether the trade dresses of competing products present a sufficient likelihood of confusion, and the helpfulness of any particular factor depends on the circumstances present in the case.  *Daddy's Junky Music*, 109 F.3d at 280; *see also, e.g.*, *Abercrombie*, 280 F.3d at 646–48 (considering only one of the eight factors, similarity of the trade dress, and ruling for the defendant on that basis).  In this case, DayCab has presented evidence that weighs in its favor on two of the factors relevant to the likelihood of confusion analysis.  Weighing DayCab's evidence against Defendants' evidence, as well as balancing the factors to determine whether the products present a sufficient likelihood of confusion, is the province of the jury.  Accordingly, we conclude that Defendants are not entitled to summary judgment based on the likelihood of confusion element.

## II.  Remaining Issues

### 1.  Admissibility of Dr. Wandling's Opinion

DayCab contends that the district court erred by denying its motion to exclude Dr. Wandling's testimony related to functionality.  We review a district court's decision to admit expert testimony for abuse of discretion.  *Osborn v. Griffin*, 865 F.3d 417, 452 (6th Cir. 2017).  "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence."  *United States v. LaVictor*, 848 F.3d 428, 440 (6th Cir. 2017) (quoting *Best v. Lowe's Home Cntrs., Inc.*, 563 F.3d 171, 176 (6th Cir. 2009)).

In order for an expert witness's opinion to be admissible under Rule 702 of the Federal Rules of Evidence, (1) the witness must be qualified by "knowledge, skill, experience, training, or education;" (2) the testimony must be relevant, meaning that it will assist "the trier of fact to

understand the evidence or to determine a fact in issue;" and (3) the testimony must be reliable, as assessed by its factual basis and the sufficiency of its principles and methods. *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208 (6th Cir. 2015) (quoting *United States v. Cunningham*, 679 F.3d 355, 379-80 (6th Cir. 2012)); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

We conclude that the district court did not abuse its discretion by declining to exclude Dr. Wandling's opinion on functionality.  DayCab argues that Dr. Wandling lacks the necessary qualifications because he does not have specific experience in fiberglass manufacturing, conversion kits, or truck body work.  Further, DayCab contends that Dr. Wandling based his opinion only on what Osman told him.  However, Dr. Wandling is a licensed professional mechanical engineer with extensive experience in the fields of design, product development, manufacture and servicing of machines, and in providing professional engineering services. Further, Dr. Wandling clarified that his opinion, while based in part on an interview with Osman, was also based on his education and experience, and on his analysis of the conversion kits.  The district court did not abuse its discretion in determining that Dr. Wandling's credentials and experience, and his independent analysis of the conversion kits, qualify him to give expert testimony about the functionality of the conversion panel features.

## 2.  Statute of Limitations

As an alternative basis for affirming the district court's grant of summary judgment on DayCab's state law claim under the Tennessee Consumer Protection Act, Defendants contend that this claim is barred by the statute of limitations.  DayCab asserted a state law claim for unfair or deceptive acts or practices under the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104(b)(1), (2), and (3).  The Act provides that any person who suffers certain injuries as a result of an unfair or deceptive act or practice described in § 47-18-104(b) may bring an action to recover damages.  Tenn. Code Ann. § 47-18-109.  The Act provides that "[a]ny action commenced pursuant to § 47-18-109 shall be brought within one (1) year from a person's discovery of the unlawful act or practice."  *Id.* § 47-18-110.  Defendants contend that DayCab discovered Prairie Technology's alleged trade dress infringement more than one year before DayCab initiated this action.

DayCab does not respond to this argument on appeal, nor did DayCab respond to this argument before the district court. Accordingly, DayCab has forfeited this issue. *See Hood v. Tenn. Student Assistance Corp. (In re Hood)*, 319 F.3d 755, 760 (6th Cir. 2003). We conclude that DayCab's state law claim under the Tennessee Consumer Protection Act is barred by the applicable statute of limitations. On this alternative basis, we affirm the district court's grant of summary judgment to Defendants on DayCab's state law claim.

### 3.  Doctrine of Laches

Finally, Defendants contend that the doctrine of laches bars DayCab's trade dress claim under the Lanham Act. Because the district court granted summary judgment in favor of Defendants on the merits, it did not decide the question of laches. However, because the issue was briefed before the district court and before this Court, we will consider the issue on appeal.

The Lanham Act does not contain a statute of limitations. Accordingly, whether a claim is barred due to a delay in filing depends on the equitable doctrine of laches. *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc*., 796 F.3d 576, 584 (6th Cir. 2015). "Laches is the negligent and unintentional failure to protect one's rights." *Id.* (quoting *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002)). "Unlike statutes of limitations, laches is not a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced." *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003). A party asserting laches must show: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Nartron*, 305 F.3d at 408.

A plaintiff's delay in asserting its rights is presumptively reasonable as long as an analogous state statute of limitations has not elapsed. *Id.* In contrast, a delay beyond the analogous limitations period "is presumptively prejudicial and unreasonable." *Id.* "For the Lanham Act claim in this case, the relevant benchmark is the one-year limitations period prescribed . . . by the Tennessee Consumer Protection Act." *See Am. Addiction Cntrs., Inc. v. Nat'l Ass'n of Addiction Treatment Providers*, 515 F. Supp. 3d 820, 838 (M.D. Tenn. 2021) (citing *Johnny's Fine Foods, Inc. v. Johnny's Inc*., 286 F. Supp. 2d 876, 881 (M.D. Tenn. 2003))

(holding one-year Tennessee Consumer Protection Act statute of limitations applies to Lanham Act trade dress infringement claims).

DayCab delayed filing its action beyond the analogous one-year limitations period. For a Lanham Act claim, the laches period begins to run when the plaintiff has "actual or constructive knowledge of the alleged infringing activity." *Narton*, 305 F.3d at 408 (quoting *Dana Corp. v. IPC Ltd. Partnership*, 674 F.Supp. 581, 583 (E.D. Mich. 1987)). Wagers became aware of Defendants' allegedly infringing products in the market around 2012. Wagers and other DayCab personnel became aware of Defendants' listing and sale of the allegedly infringing products on their websites in 2015 or 2016. However, DayCab did not file this action until 2020. Therefore, DayCab filed beyond the analogous limitations period and its claim is subject to a presumption that the delay in filing was unreasonable and prejudicial.

To excuse its delay, DayCab relies on the doctrine of progressive encroachment. The doctrine of progressive encroachment excuses delay, allowing a plaintiff to wait to bring an action until the "likelihood of confusion looms large." *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 570–71 (6th Cir. 2000) (quoting *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996)). This doctrine allows a plaintiff to demonstrate that "although it might have been justified in bringing suit earlier but did not, certain factors now exist that have prompted it to do so." *Id.* at 571. As we have explained:

> Progressive encroachment is relevant in assessing whether laches or acquiescence may be used to bar a plaintiff's trademark claim; it applies in cases where the defendant has engaged in some infringing use of its trademark—at least enough of an infringing use so that it may attempt to avail itself of a laches or acquiescence defense—but the plaintiff does not bring suit right away because the nature of defendant's infringement is such that the plaintiff's claim has yet to ripen into one sufficiently colorable to justify litigation.

*Id.* at 570. To apply the doctrine of progressive encroachment, something about the defendant's infringement must "have changed significantly," such as an expansion of its marketing efforts or entrance into new areas of business that more directly compete with the plaintiff. *Nartron*, 305 F.3d at 410.

DayCab argues that it acted reasonably in waiting to file the suit until Defendants' allegedly infringing products became prominent in the market, and that progressive encroachment therefore excuses its delay. In support, DayCab points to the timeline on which its awareness of Defendants' allegedly infringing products developed. When Wagers first began noticing Defendants' allegedly infringing products in 2012, "they were few and far between" and "did not initially make a significant impact on DayCab's sales." DayCab's Resps. to Interrogs., R. 199-2, Page ID #3014. In 2015 or 2016, when Wagers and other DayCab personnel noticed Defendants' allegedly infringing products for sale on Defendants' websites, Wagers "did not consider that the sales of the offending products were making a significant impact on DayCab's sales." *Id.* By 2018 or 2019, Wagers "began to see more and more of the offending products on the highway" and "began to believe that the Defendants' actions were generating sufficient confusion and causing sufficient harm to justify litigation." *Id.*

In his declaration, Wagers stated: "[a]s the years passed, I began to suspect that the Prairie Technology/Big Truck Parts replicas were significantly cutting into DayCab's sales and becoming a significant drain on DayCab revenues and a significant threat to the company." Wagers Decl., R. 188, Page ID #2324. Beginning in 2017, Wagers stated that he "began seeing more and more" of Defendants' allegedly infringing products in the market and "became concerned" because it indicated that Defendants were "more seriously encroaching on [DayCab's] business," and that "[u]ntil that point, I did not consider Prairie Technology/Big Truck Parts to be a significant problem that we should be worried about or that would be worth pursuing a lawsuit." Wagers' Second Decl., R. 206-1, Page ID #3218-19. DayCab sent a cease-and-desist letter to Defendants in March 2019, and when Defendants failed to respond, filed suit in January 2020.

Defendants contest DayCab's narrative, contending that there has been no significant change in the appearance of Defendants' allegedly infringing products since 2012, and no significant change in their advertising or marketing since 2015 or 2016, that would support excusing DayCab's delay under a theory of progressive encroachment. However, as described above, DayCab has presented evidence showing the increased presence of Defendants' allegedly infringing products in the market, which prompted DayCab to file suit when it did. Accordingly,

it appears that the doctrine of progressive encroachment justifies DayCab's delay in filing suit, and that Defendants cannot establish the equitable defense of laches at the summary judgment stage.

However, we acknowledge that factual disputes remain that bear on this analysis, including the growing presence of Defendants' allegedly infringing products in the market, the effect of that growth on the likelihood of confusion between the products, and when the infringement was of such significance as to ripen DayCab's claim into one "sufficiently colorable to justify litigation." *See Kellogg*, 209 F.3d at 570. Although a court, rather than a jury, will ultimately determine the applicability of laches to DayCab's claim, as laches is an equitable defense, that determination is not always appropriate at summary judgment, if the issue implicates questions of fact appropriate for resolution at trial. *See Innovation Ventures, LLC v. Custom Nutrition Lab'ys, LLC*, 912 F.3d 316, 344 (6th Cir. 2018) (affirming the district court's conclusion that disputes of material fact existed related to the issue of laches that precluded summary judgment). Therefore, we refrain from deciding the issue of laches and remand it to the district court to decide in the first instance following resolution of these factual disputes by the jury.[2]

In any event, even if the laches issue is ultimately resolved in favor of Defendants, that resolution will not fully resolve the merits of this action because laches "bars damages that occurred before the filing date of the lawsuit" but does not prevent a plaintiff from obtaining injunctive relief or post-filing damages. *Nartron*, 305 F.3d at 412.

---

[2]Although we recognize that laches is an equitable remedy, usually reserved to be decided by the court, there is case authority indicating that it may be appropriate for the court to address laches only after certain factual matters are litigated and resolved. *See Innovation Ventures*, 912 F.3d at 344; *see also Mem'l Hall Museum, Inc. v. Cunningham*, 455 F. Supp. 3d 347, 360–361 (W.D. Ky. 2020) (holding that it was not appropriate to decide whether laches applied at the summary judgment stage because material disputes of fact existed); *Milcrofton Util. Dist. of Williamson Cnty., Tennessee v. City of Brentwood, Tennessee*, 458 F. Supp. 3d 757, 774 (M.D. Tenn. 2020) (holding that questions of fact precluded summary judgment on the laches issue).

**CONCLUSION**

For these reasons, we **AFFIRM IN PART** and **REVERSE IN PART** the district court's grant of summary judgment.  Specifically, we **REVERSE** the grant of summary judgment to Defendants on DayCab's trade dress claim under the Lanham Act.  We refrain from deciding whether the doctrine of laches applies to DayCab's claim and remand the laches issue to the district court for determination in the first instance following resolution of factual disputes by a jury.  We **AFFIRM** the grant of summary judgment on DayCab's state law claim on the alternative basis that it is time barred.  Finally, we **AFFIRM** the district court's ruling on DayCab's motion to exclude the testimony of Defendants' expert Dr. Wandling.  We **REMAND** this case for further proceedings consistent with this opinion.